[Sac. No. 6473. In Bank. Jan. 14, 1955.]

M. F. GELHAUS et al., Plaintiffs; A. F. GELHAUS et al., Appellants, v. NEVADA IRRIGATION DISTRICT, Respondent.

Floyd H. Bowers and Thomas F. Sargent for Appellants.

Minasian & Minasian, P. J. Minasian, James K. Abercrombie, Vernon F. Gant, Ronald Harris, Harry Horton and Rutherford, Jacobs, Cavalero & Dietrich for Respondent.

TRAYNOR, J.—Plaintiffs A. F. Gelhaus and Elvera H. Gelhaus appeal from a judgment entered after the granting of defendant's motion for judgment notwithstanding the verdict in an action brought to recover damages for breach of a contract to supply water. Stated most favorably to plaintiffs, the facts are as follows: In May, 1950, defendant irrigation district's ditch tender Huber took the application of A. F. Gelhaus, hereinafter referred to as plaintiff, for 10 miner's inches continuous flow of water, knowing that plaintiff would run it through his fish hatchery located on land owned by him. It was understood that after the water was

run through the hatchery it would be used by plaintiff's son to irrigate 20 acres of pasture land farmed by the latter. Plaintiff signed a written application for water prepared on a form supplied by defendant. The application was also signed by Huber and approved by defendant's main office. It provided that "The Applicant requests you to supply water for *Irrigation* purposes . . . . Continuous flow of *10* miner's inches . . . . To be used on the property owned by *A. F. Gelhaus* . . . . Acres irrigated: Orchard . . . . . . . ., Garden . . . . . . ., Pasture *20* . . . . . ., Crop Acreages *20* . . . . . . . Service of water to be in accordance with conditions printed on the back of this application. . . ." (The italicized parts were written in on the printed form.) Although plaintiff's son signed the application in the place provided for the applicant's signature, plaintiff also signed it in the blank following the words "Collect from" with the understanding that he was to be a party to the contract. It was provided on the back of the application that it was made "under and subject to the By-Laws, Rules and Regulations, and rates of tolls and charges adopted or to be adopted by the Board of Directors" of defendant, and a copy of the rules and regulations was given to plaintiff. On the morning of September 4, 1950, plaintiff discovered that the fish in his hatchery were dead or dying owing to a water failure. No water was running from defendant's ditch into plaintiff's ditch, and plaintiff's reservoir, which could hold a two-day supply of water, was empty. Although at the trial defendant introduced evidence that there was no water shortage on September 4th and that an adequate supply was being delivered to the ditch that supplied plaintiff, plaintiff and another witness testified that defendant's superintendent told them the day after the fish were lost that the water had been shut off. On the basis of the foregoing facts the jury returned a verdict in favor of plaintiffs for $9,416, the value of the fish lost.

Defendant contends that the trial court properly granted its motion for judgment notwithstanding the verdict on the ground that the written contract precludes imposing liability for the loss of fish. It relies primarily on rule 15 of its rules and regulations, which provides that "No purchaser of any water from the District acquires any proprietary right therein by reason of such use, nor does such purchaser acquire any right to re-sell such water, or to use it for a purpose other than that for which it was applied, nor to use it on

premises other than as stated at the time of making application.'' █ It has been held in this state that a water company is not liable for damages resulting from a failure to supply water for a particular use in the absence of a specific undertaking to supply water for that use. (*Hunt Bros. Co. v. San Lorenzo etc. Co.*, 150 Cal. 51, 59 [87 P. 1093, 7 L.R.A. N.S. 913] ; *Niehaus Bros.* v. *Contra Costa Water Co.*, 159 Cal. 305, 318 [113 P. 375, 36 L.R.A.N.S. 1045] ; see *San Leandro* v. *Railroad Com.*, 183 Cal. 229, 233 [191 P. 1].) It would appear that one purpose of rule 15 was to insure the applicability of the foregoing holdings and thus limit the risks assumed by defendant to those flowing from a failure to supply water for the purpose stated in the application. █ Moreover, it was entirely reasonable for defendant to limit its undertaking. Defendant is an irrigation district serving a mountainous county. Most of its water is supplied through open canals and ditches. Thus the water supplied to plaintiff had to flow through 50 miles of mountain ditches and flumes before it reached the Sontag ditch from which plaintiff was supplied. The Sontag ditch itself was 2½ miles long, and plaintiff's outlet was the last of 14 on that ditch. Defendant's experience demonstrated that it was impossible to prevent interruptions in service at the end of such a ditch system with the personnel available to it. Despite these difficulties, however, defendant was in a position to supply adequate service for irrigation purposes. Temporary interruptions in such service would ordinarily be harmless and the shortages so caused could be made up by supplying additional water after service was restored. A fish hatchery, on the other hand, requires a constant flow of water to supply oxygen to the fish, and an undertaking to supply water adequate for hatchery purposes would involve duties defendant was not in a position to discharge. Accordingly, by providing in its contract that plaintiff acquired no right to use the water for other than irrigation purposes, defendant made clear that it was under no duty to supply water for other purposes, and it cannot therefore be held liable for damages occasioned solely by the inadequacy of its service to satisfy such purposes.

█ Plaintiff contends, however, that use of the water for a fish hatchery was not excluded by the terms of the contract but was included within the meaning of the provision for the irrigation of 20 acres of crop. He points out that in the fish raising business it is common to refer to fish

as a crop and to measure production in terms of so many fish or pounds of fish per acre. He also relies on the extrinsic evidence that Huber knew he wanted the water for his hatchery; that other water users operated hatcheries with water supplied by defendant under the same contract provision; and that on 16 occasions defendant restored service after interruptions at his request knowing that he was in immediate need of water for his hatchery. When the provision for the irrigation of 20 acres of crop is considered in the light of all of the surrounding circumstances, however, it is not reasonably susceptible of the interpretation contended for by plaintiff, and the extinsic evidence relied upon by him does not support his position.

The stated purpose for which the water was applied aptly described the use to be made of it by plaintiff's son, who signed the contract as applicant. Plaintiff's son had leased 20 acres of pasture from plaintiff on which he raised clover, and he used the water supplied by defendant to irrigate this land. There is no suggestion in the language of the contract that another unspecified purpose was included within its terms, and there was no evidence that plaintiff understood the provision for water for irrigation of 20 acres of crop to mean water for his hatchery. The surface area of the water in the hatchery was not more than a fraction of an acre, and plaintiff testified that he did not use the water for irrigation thus indicating that he did not understand that word in the sense for which he now contends. Moreover, the only purpose for which plaintiff wanted the water was to run it through his hatchery, and it is hardly conceivable that had he intended to have the right to do so secured by the terms of his written contract, he would have left it to be inferred from the provision that on its face deals only with his son's needs.

The fact that defendant knew that plaintiff and other subscribers under similar contracts used its water for raising fish or wanted it primarily for that purpose is not evidence that by contracting to supply water for irrigation it assumed the obligation to provide service adequate for a hatchery. The operation of a fish hatchery requires a constant flow of water to supply the fish with adequate oxygen. Irrigation needs, on the other hand, may be met with much less regular service, and shortages may be made up by additional service after temporary stoppages. ██ By contracting to supply a continuous flow for irrigation purposes defendant

assumed only those risks of damages that would ordinarily result from temporary interruptions in the supply of water for irrigation. On the other hand, it was of no concern to defendant that its subscribers might run its water through their hatcheries so long as defendant was not required to provide service adequate for that use. Moreover, the record makes clear that defendant did not at any time render adequate service to plaintiff for the supply of his hatchery and that in the past plaintiff had governed his operations accordingly. He maintained a reservoir with a two-day capacity, which he checked daily, and on three-hours notice he could arrange to supply his hatchery with water from another source. It does not appear from the record why these precautionary measures failed to prevent plaintiff's loss in this case. Another of defendant's subscribers testified that he had storage capacity for a week's supply of water because he knew of the difficulties defendant had in supplying water. On 16 occasions before the water failure of September 4th plaintiff had to notify defendant of a water shortage and on one of these occasions he lost some of his fish. Since defendant was obligated to supply water for irrigation purposes, however, the fact that it responded to plaintiff's calls by restoring service on these occasions does not indicate any admission on its part of an obligation to supply water for hatchery purposes.

There is likewise no merit in plaintiff's contention that defendant's conduct after the contract was executed estops it from relying on the stated purpose of its service as a limitation upon the liability it assumed. Thus, as stated above, defendant at no time led plaintiff to believe that he could rely on its service for the supply of his hatchery, and the most that he could expect on the basis of past experience was that service would be restored a few hours after complaint was made. Plaintiff testified, however, that by the time he discovered the water failure of September 4th, it was too late to save his fish within the time ordinarily required to restore service.

The judgment is affirmed.

Gibson, C. J., Edmonds, J., Schauer, J., and Spence J., concurred.

CARTER, J.—I dissent.

The majority opinion does not give proper effect to the extrinsic evidence which the jury found adequate in con-

struing the contract as requiring that water be supplied for a fish hatchery.

When this case was before the District Court of Appeal, Third Appellate District, Mr. Justice Schottky of that court prepared a very able and learned opinion which adequately disposes of all of the issues in this case, which opinion was concurred in by Presiding Justice Van Dyke and Mr. Justice Peek of that court. The District Court of Appeal in said opinion held that the trial court erred in granting respondent's motion for judgment notwithstanding the verdict. It reversed the judgment with directions to the trial court to enter judgment on the verdict. The opinion of the District Court of Appeal is reported in 265 P.2d at page 530. I am in full accord with the views expressed by the District Court of Appeal in said opinion and I adopt the same as my dissent.

Shenk, J., concurred.